## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CEDAR RAPIDS DIVISION

| | |
|---|---|
| TRUSTEES OF THE I.B.E.W. LOCAL UNION 405 DEFERRED SAVINGS FUND and TRUSTEES OF THE I.B.E.W. LOCAL UNION 405 HEALTH AND WELFARE FUND, | |
| Plaintiffs, | No. C02-0048 |
| vs. | **ORDER** |
| DUBALL ELECTRIC, INC., | |
| Defendant. | |

--------------------------------------------------------------------------------

| | |
|---|---|
| DUBALL ELECTRIC, INC., | |
| Third-Party Plaintiff, | |
| vs. | |
| LOCAL UNION 405, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL-CIO, | |
| Third-Party Defendant. | |

This matter comes before the court pursuant to a trial on the merits held July 28-29, 2005. Plaintiffs Local 405 Trustees of the I.B.E.W. Local Union 405 Deferred Savings Fund and Local 405 Trustees of the I.B.E.W. Local Union 405 Health and Welfare Fund were represented by Joseph Day and Yara El-Farhan Halloush. Defendant Duball Electric, Inc., was present and represented by Mollie Pawlosky. The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) (docket number 119).

# I. INTRODUCTION

## A. Nature of the Case

The plaintiffs in this matter, Local 405 Trustees of the I.B.E.W. Local Union 405 Deferred Savings Fund (Plaintiff Pension Fund) and Local 405 Trustees of the I.B.E.W. Local Union Health and Welfare Fund (Plaintiff Health Fund), hereafter collectively referred to as Plaintiff Local 405, filed suit against Duball Electric, Incorporated (Defendant DE, Inc.), Jerry Duball, Sr., Jerry Duball, Jr., Tamara K. Winn, and Kay Duball under Sections 302(c)(5) of the Labor Management Relations Act (LMRA), 29 U.S.C. § 186(c)(5), §§ 502(a)(2)(3) and 515 of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1132(a)(2), 1132(a)(3), and 1145. Specifically, Plaintiff Local 405 claims that the defendants failed to make appropriate contributions to the Pension Fund and the Health Fund on behalf of eligible employees, pursuant to the Employee Retirement Income Security Act of 1974 (ERISA).[1] Plaintiff Local 405 claims that the defendant is delinquent in contributions for employees Eric Baily, Zachariah Hale, Chris Carter, Dustin Novak, Ryan Gericke, B.J. Myrick, and J. Keith Collins. The defendant argues that it never had the duty to contribute on behalf of these employees because the collective bargaining agreement does not define what is "covered" work for the purpose of contributions, and because the employees in question were never properly classified[2] so as to put the defendant on notice that contributions were due. The court has

---

[1] In the court's March 31, 2005 Order granting the defendants' motion for summary judgment and denying the plaintiffs' motion for summary judgment (docket number 156), the court granted summary judgment in favor of the defendants on the plaintiffs' ERISA claim against Jerry Duball, Sr. and on plaintiffs' RICO claims against all of the individual defendants.

[2] Specifically, the defendant argues that pursuant to a side agreement between the defendant and the Union, it was the Union's responsibility to classify the defendant's employees. The court rejected this argument in its Order granting Third Party Defendant 405's motion for summary judgment on the plaintiffs' claim for breach of contract based on this alleged oral agreement (docket number 155 ) ("[I]f the court assumes . . . that evidence concerning the verbal agreement could be permitted under the parol evidence (continued...)

previously found that the relevant time period for contributions at issue in this case is August 1, 2000 through December 10, 2001.[3] The court makes the following findings of fact and conclusions of law.

## II. FINDINGS OF FACT

### A. Factual Background

In approximately 1965, Jerry Duball, Sr. became an electrical apprentice with the Iowa Electrical Joint Apprenticeship Training Committee (JATC). Upon his completion of the apprenticeship program, Jerry Duball, Sr. became an electrician. Jerry Duball, Sr. started Duball Electric in approximately 1978. The previously unincorporated Duball Electric was an electrical contracting business that was owned by Jerry Duball, Sr. and Kay Duball. Duball Electric became incorporated in December, 1996 by Jerry Duball, Sr., and initially had two shareholders, Jerry Duball, Sr. and Kay Duball. After Defendant DE, Inc.'s incorporation in 1996, Duball Electric no longer existed. Since incorporation of Defendant DE, Inc., Jerry Duball, Sr. has acted as president and Kay Duball has acted as an officer and director. From 1999 through 2001, Kay Duball was the Treasurer and a director of Defendant DE, Inc. Jerry Duball, Sr. and Kay Duball have two children, Jerry Duball, Jr. and Tamara Winn. Winn was at all relevant times Defendant DE, Inc.'s bookkeeper and as part of her responsibilities she completed the contribution paperwork. Jerry Duball, Jr. began working for Duball Electric after

---

[2](…continued)
rule, such evidence merely establishes an impermissible verbal side agreement between Defendant DE, Inc. and the Union concerning the administration of an ERISA plan, which is not binding due to the written agreement requirements of ERISA and the LMRA. Because the verbal agreement between Defendant DE, Inc. and Plaintiff Local 405 concerning classification of bargaining unit employees is unenforceable under both the LMRA and ERISA, Defendant DE, Inc.'s claim for breach of contract based on that verbal agreement must fail.")

[3] See the court's March 31, 2005 Order granting the defendants' motion for summary judgment and denying the plaintiffs' motion for summary judgment (docket number 156).

graduating from college in 1991 and continues to work for the now incorporated Defendant DE, Inc. Jerry Duball, Jr. participated in the apprenticeship program for Local 405, during which time he was employed by Duball Electric.

The previously unincorporated Duball Electric became bound to a collective bargaining agreement when Kay Duball executed a letter of assent to bargain collectively with Plaintiff Local 405 on October 9, 1989. On November 27, 1996, Kay Duball, on behalf of Duball Electric sent a letter to Plaintiff Local 405, stating:

> This letter is to inform you in a timely fashion that Duball Electric is hereby withdrawing from the Multi-employer bargaining assent for the Inside Agreement, previously given by it to the Cedar Rapids/Iowa City Division, Iowa Chapter, NECA for the purpose of collective bargaining. By copy of this notice we are also advising the NECA Office Iowa Chapter of this cancellation of any and all letters of assent, Form "A", which may be or were on file with the Chapter and/or IBEW Local Union #405."

On May 13, 1999, the JATC sent a letter to Defendant DE, Inc. stating that "[t]he Cedar Rapids JATC has recently been made aware of the fact that Duball Electric no longer is a signatory employer with [Plaintiff Local 405]." On January 25, 2000, the JATC sent a letter to Defendant DE, Inc., which stated:

> One of the many items placed on the agenda was to re-visit the issue of Duball Electric's non-signatory status with [Plaintiff Local 405]. The Cedar Rapids JATC had informed [Duball Electric] by previous written correspondence dated May 12, 1999, that unless Duball Electric became a signatory contractor the Cedar Rapids JATC would be forced to remove all apprentices currently in [Defendant DE, Inc.'s] employment . . .

The letter went on to inform Jerry Duball, Sr. that if Defendant DE, Inc. did not become a signatory by 10:00 a.m. on Friday, January 28, 2000, the JATC would remove all apprentices indentured to the Cedar Rapids apprenticeship program from employment with Defendant DE, Inc. Jerry Duball, Sr. did not sign a letter of intent on or before January 28, 2000.

On June 27, 2000, the Cedar Rapids Labor Management Committee, a joint committee consisting of Plaintiff Local 405 and the NECA, refused to address a grievance involving Defendant DE, Inc., stating that "[t]he Labor-Management Committee will not hear a case regarding [Defendant DE, Inc.] until [Jerry Duball, Sr.] signs a letter of assent." The defendant admits that "during the period January 1, 1999 through July 2000, [Defendant DE, Inc.] filed certain contribution reports with OBA Midwest, Ltd., the Funds' Third-Party Administrator, and that [Defendant DE, Inc.] made certain contributions to the Health and Welfare Fund and Pension Fund for some of the employees of [Defendant DE, Inc.]."

On August 1, 2000, Jerry Duball, Sr., on behalf of Defendant DE, Inc., signed two letters of assent after engaging in conversations with Tom Shea, the business manager of Plaintiff Local 405.[4] The letters of assent provided that they were to "remain in effect until terminated by the undersigned employer giving written notice to the Cedar Rapids/Iowa City Division, Iowa Chapter NECA and to the Local Union at least 150 days prior to the then current anniversary date of the applicable approved Labor Agreement." Defendant DE, Inc. withdrew from the letters of assent on December 10, 2001.

### B. The Relevant Documents

#### 1. The Collective Bargaining Agreement

By signing the letters of assent, Defendant DE, Inc. agreed to be bound by the collective bargaining agreement between Plaintiff Local 405 and the NECA.[5] The relevant provisions of the collective bargaining agreement, as agreed by the parties, are as follows:

---

[4] By their terms, the letters of assent were to become effective August 1, 2000, were signed by Jerry Duball, Sr. on August 1, 2000, and were signed by Tom Shea on August 8, 2000.

[5] The court notes that the original, signed collective bargaining agreement was misplaced and has never been found throughout the course of this litigation. After sufficiently establishing authenticity, the defendant did not object to the admission of an unsigned copy of the collective bargaining agreement at trial.

Section 2.07(a). All Employers or Contractors working within the jurisdiction of Local Union #405, shall contribute to the Health and Welfare Fund the sum of two dollars and twenty cents ($2.20) per hour per man for each hour working time, plus two dollars and twenty cents ($2.20) per hour on all double time premium hours, or plus one dollar and ten cents ($1.10) per hour on all time and one-half premium hours worked for each employee who performs work covered by this Agreement as shown by the Employer's payroll report. Said payments shall be made monthly with provided transmittal forms in a manner set forth in Article II, Section 2.28. Checks are to be made payable to. . . . The Health and Welfare Fund is created for the health and welfare of the members of the electrical industry . . . (b) The Employers and the Union agree that all Employers signatory to this Agreement and other parties mutually agreed to be covered by same shall pay a sum equal to three dollars fifty cents ($3.00) per hour on the actual hours worked, plus three dollars ($3.00) per hour on all double time premium hours, or plus one dollar and fifty cents ($1.50) per hour on all time and one-half premium hours worked for each employee who performs work covered by this Agreement as shown by the Employer's payroll report. Said sum shall be paid monthly . . . and shall be accompanied by a payroll report form. . . .

The collective bargaining agreement further provided that it:

shall be subject to change or supplement at any time by mutual consent of the parties hereto . . . [a]ny such change or supplement agreed upon shall be reduced to writing, signed by the parties hereto, and submitted to the International Office of the IBEW for approval, the same as this Agreement.

Additionally, the agreement provides for penalty to be imposed in the event of delinquent contributions and reports, in relevant part, as follows:

PENALTY FOR DELINQUENT CONTRIBUTIONS. All reports and contributions that are not received by the twenty-fifth day following the end of each calendar month shall be deemed delinquent and shall be assessed liquidated damages amounting to fifty dollars ($50.00) per day for each and every working day the reports and contributions are delinquent. . . . In the event the trustees are required to place any contractor

> account in the hands of legal counsel for collection, the employer shall be liable, in addition to all scheduled contributions, for all attorneys' fees and all reasonable costs incurred in the collection process including but not limited to filing fees, sheriff's fees, audit costs, interest and other expenses incurred by the trustees.

Pursuant to the collective bargaining agreement, Defendant DE, Inc. was required to make contributions to the plaintiff Funds in accordance with the collective bargaining agreement on behalf of its bargaining unit employees.

## 2. The Health and Welfare Plan and Trust Agreement

The Amended and Restated Health and Welfare Plan and Trust Agreement states that "[p]ayments to the Plan should be made by Employers in accordance with their collective bargaining or other written agreements." The relevant portions of Plaintiff Health Fund's Trust Agreement, as agreed by the parties, are as follows:

> Article II, Creation and Acceptance of Trust
> All payments previously and hereafter made by Employers to the Plan pursuant to collective bargaining or other written agreements and such other payments as shall from time to time be made to the Plan by or on behalf of Employers and Employees, and all other money or property as shall lawfully become a part of the Trust, together with the income, gains and all other increments of any nature whatsoever, if any, therefore shall be held, managed and administered in trust pursuant to the terms of this Agreement.
>
> Article III, Purposes and Payments To and From Plan
> Payments to the Plan shall be made by Employers in accordance with their collective bargaining or other written agreements and rules of the Trustees . . .
>
> Article VIII, Contributions and Collections
> Each Employer shall make continuing and proper payments to the Plan as required by the collective bargaining or other written agreement to which each such Employer is a party.
>
> Article XII, General Provisions

Title to the trust shall be vested in and remain exclusively in the Trustees and no Employer, Union, Employee or any beneficiary shall have any right, title or interest in the Trust nor right to any contributions to be made thereto, except only as provided from time to time by this Agreement or by any group insurance policy purchased hereunder and then only to the extent of the benefits payable from such policy or out of the Trust.

### 3. Pension Fund Trust Agreement

The Plaintiff Pension Fund Trust Agreement states, "[w]hereas, the [NECA], Employer and the Union have entered into Collective Bargaining Agreements," and defines "employer" as "any Association, individual, partnership or corporation . . . who now has or shall hereafter have a collective bargaining agreement with the Union." The Pension Fund Trust Agreement governs contributions commonly referred to as "defined" contributions as well as elective contributions, commonly referred to as "401K contributions." The relevant portions of Plaintiff Pension Fund's Trust Agreement, as agreed by the parties, are as follows:

Preamble:
[T]he Trustees declare that they will receive and hold the deferrals and any other money or property which may come into their hands as Trustees . . .

Article I, Definitions
Section 1.08 Deferred Fund: Shall mean the Trust Estate established pursuant to this Agreement and Declaration of Trust and shall include all property of whatsoever nature contributed to the Fund by Employers, together with whatever additional income or funds are received from investments or other sources permitted by law.

Section 1.09: Employer Deferrals: Shall mean contributions made by Employers to the Deferral Fund pursuant to their Collective Bargaining Agreement with the Union.

Article IV, Contributions to the Fund
The Employers shall contribute to the Fund at the rate of deferral and on the basis stipulated in the Collective Bargaining

8

Agreement in effect between the Union and the Association for all of the Employees within the coverage of the Collective Bargaining Unit aforementioned, and thereafter such sums as stated on the dates specified in the Collective Bargaining Agreement entered into between the parties hereinabove mentioned.

Article V, Trust Fund
As hereby created the I.B.E.W. Local 405 Deferral Savings Fund shall comprise the entire assets derived from Employer deferral contributions made to or for the account of this Fund under Collective Bargaining Agreements, together with any and all investments made and held by the Trustees, or monies received by the Trustees as deferral contributions or as income from investments made and held by the Trustees or otherwise, and any other money, or property received and/or held by the Trustees for the uses, purposes, and trust set forth in this Agreement and Declaration of Trust and the receipt of which would not compromise the tax exempt status of the Fund.

## C. Definition of "Work Covered" by the Collective Bargaining Agreement

None of the relevant documents in this case; the collective bargaining agreement, the Health and Welfare Plan and Trust Agreement, or the Pension Fund Trust Agreement, specifically set forth how employees are to be classified, whose responsibility it is to classify employees, or what constitutes "work covered" by the collective bargaining agreement for which contributions are due. The testimony at trial indicated that it is common practice to contact the NECA office if a question concerning the interpretation of a term or phrase in a collective bargaining agreement arises.[6]

The undisputed evidence presented at trial established that the defendant was the party responsible for assigning work to their employees, and the Union had no involvement in job assignments. Jerry Duball, Sr. and Jr. routinely assigned work to their employees in the mornings.[7] Jerry Duball, Sr. and Jr. issued "job tickets" to their employees. Job

---

[6] See testimony of Chuck Swore.

[7] Testimony of John Gorman.

tickets were records containing the name of the job, the job material expected to be used, and the time to be spent performing the job.[8] The defendant's employees were compensated based on their time cards and job tickets. If an employee's time card and job ticket were inconsistent, the defendant would contact the employee in an effort to clarify the discrepancy.[9]

### D. Patrick Heller's Audit

Sometime in 2001, one or more of the defendant's employees approached the Union hall, requesting benefits. The employees were told that they had no benefits, despite the employees' belief that they had been performing work for the defendant that was covered by the collective bargaining agreement. In response, meetings were held to further examine why the defendant was not contributing on behalf of certain employees. Jerry Duball, Sr. was present for at least one of the meetings held concerning the contributions, and offered that if there had been a misunderstanding, he was more than willing to clear it up.

The Union ordered an audit of the defendant's payroll and contribution records. At the Union's request, Patrick Heller performed an audit for Plaintiff Health Fund and Plaintiff Pension Fund in September, 2001. Mr. Heller analyzed the defendant's payroll tax returns, time cards, and other job records in performing the audit. Mr. Heller also determined what he deemed to be the proper classification of employees, based on their time cards, other payroll records, and interviews with some of the employees. Mr. Heller focused on any employees of the defendant's who were classified, or who he classified, as performing electrical distribution work He compared the hours reported to the hours actually worked, per the time cards and payroll records, for the employees. The plaintiffs presented Mr. Heller's findings to the court in support of their motion for summary judgment. In its Order denying the plaintiffs' motion for summary judgment, the court

---

[8] Testimony of John Gorman.

[9] Testimony of John Gorman.

indicated that Mr. Heller's report did not provide adequate proof that contributions were due on behalf of the seven employees in question. At trial, Mr. Heller was called to testify concerning his reports, and it was clear that there were problems with Mr. Heller's reports. The court, therefore, notes that it does not rely on Mr. Heller's audit report in determining what contributions, if any, are due.

### E. The Employees at Issue

The court makes the following findings based on the testimony of several of the defendant's employees, as well as time cards and other job related documentation submitted at trial. Eric Baily was employed with the defendant as an electrician.[10] As part of his job duties, he pulled wire and ran pipes for installing wire in commercial facilities.[11] Dustin Novak was also employed by the defendant as an electrician.[12] Likewise, B.J. Myrick was employed by the defendant doing electrical work.[13] Ryan Gericke was employed by the defendant full time beginning in May of 2001, performing electrical work.[14] Chris Carter was also employed with the defendant performing electrical work.[15] Likewise, Keith Collins was employed with the defendant performing

---

[10] Testimony of Eric Baily ("I know that's all I did was electrical work . . . that's- - that's what I was hired for.") See also testimony of John Gorman.

[11] Testimony of Eric Baily. Austin Novak, who worked as a journeyman with the defendant at some point during the relevant time period, also testified that he worked with Eric Baily on such projects.

[12] Testimony of Eric Baily, Austin Novak, Ryan Gericke.

[13] Testimony of Austin Novak, Ryan Gericke.

[14] Testimony of Ryan Gericke.

[15] Testimony of Ryan Gericke.

electrical work.[16] Zachariah Hale worked for the defendant as a residential wire man, wiring homes.[17]

### III. CONCLUSIONS OF LAW

### A. "Work Covered" Under the Collective Bargaining Agreement

In order to prevail on their claims in this case, the plaintiffs must demonstrate by a preponderance of the evidence that the defendant was obligated to make the claimed contributions and that it failed to do so. See Section 515 of ERISA, codified at 29 U.S.C. § 1145 ("Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.")  "As part of their threshold burden, the plaintiffs must produce evidence proving there actually existed some employees who performed covered work that was unreported to the Plan.  Once [the plaintiffs] produce evidence raising genuine questions about the accuracy of the [defendant's] records and the number of hours worked by the employees, the burden then shifts to the [defendant] to come forward with evidence of the precise amount of work performed." Trustees of the I.B.P.A.T. Local 447 Pension Plan v. Five Seasons Paint and Drywall, Inc., 01-CV-0027 (N.D. Iowa 11/5/2002) (citing Brick Masons Pension Trust v. Indust. Fence & Supply, 839 F.2d 1333, 1338 (9th Cir. 1998); Motion Picture Indus. Pension & Health Plans v. N.T. Audio Visual Supply, Inc., 259 F.3d 1063, 1066-67 (9th Cir. 2001) (internal citations omitted).

Both parties agree that there is no definition of "work covered" by the collective bargaining agreement within the collective bargaining agreement itself or within either of the Trust documents.  At the conclusion of the two-day bench trial, the court directed the

---

[16] Testimony of Ryan Gericke.

[17] Testimony of John Gorman, Eric Baily, Ryan Gericke.  Mr. Gorman testified that he remembered Mr. Hale being assigned such jobs during the daily morning job assignments.

plaintiffs to provide authority for the proposition that the court may enforce a definition of "covered work" that is not explicitly set forth in the collective bargaining agreement but rather is based on a common understanding amongst those working in the electrical field. The plaintiffs assert that they have satisfied their initial burden.

First, the plaintiffs argue that the collective bargaining agreement in this case was a "pre-hire" agreement under Section 8(f) of the LMRA, codified at 29 U.S.C. § 158(f), rather than a "full" Section 9(a) agreement which requires majority support. The significance of the agreement being under Section 8(f), rather than Section 9(a), according to the plaintiffs, is that (1) Section 8(f) agreements are subject to repudiation at any time by the employer and unless or until such time as the employer repudiates, the employer "is expressly obligated to comply with all terms and conditions of the applicable collective bargaining agreement";[18] (2) the terms and conditions that the employer is bound to apply to all of the employer's employees other than those performing clerical, management, or guard tasks;[19] and (3) in the context of 8(f) agreements, it is all hours worked by an employee which form the basis for calculating the appropriate amount of contributions.[20]

In response, the defendant argues that Section 8(f) of the LMRA "does not define what constitutes 'covered work' pursuant to the collective bargaining agreements." The defendant further argues that, contrary to the plaintiffs' contention, 29 U.S.C. § 159(b) "does not dictate that all DEI employees except clerical, management, or guards are considered the 'bargaining unit' that performs work covered by the CBA." Rather, the defendant argues, 29 U.S.C. § 159(b) simply addresses the Board's ability to determine the bargaining unit. Neither 29 U.S.C. §§ 158(f) and 159(b), according to the defendant, "define what constitutes 'covered work' for purposes of this action."

---

[18] The plaintiffs cite to <u>Operating Engineers Pension Trust and Operating Engineers Health & Welfare Fund v. Beck Engineering & Surveying Co.</u>, 746 F.2d 557 (9th Cir. 1984); <u>Benson v. Brower's Moving & Storage, Inc.</u>, 907 F.2d 310, 315 (2d Cir. 1990).

[19] The plaintiffs cite to 29 U.S.C. § 159(b).

[20] The plaintiffs cite to <u>Kemmis v. McGoldrick</u>, 706 F.2d 993 (9th Cir. 1983).

Second, the plaintiffs argue that <u>Central States, Southeast and Southwest Areas</u> <u>Pension Fund v. Independent Fruit and Produce Co.</u>, fully supports the contention that the court in this case may find that there existed a common understanding as to the meaning of the phrase "work covered" by the collective bargaining agreement, and apply that commonly understood definition to the collective bargaining agreement in this case.  In <u>Central States, Southeast and Southwest Areas Pension Fund v. Independent Fruit and</u> <u>Produce Co., et al.</u>, 919 F.2d 1343 (8th Cir. 1990), the plaintiff pension fund sued for allegedly delinquent contributions on behalf of unreported employees.  The defendants argued that the employees at issue were not covered by the collective bargaining agreement.  The dispute, in <u>Central States</u>, centered around the meaning of the term, "casual employees," as used in the collective bargaining agreements.  Under the collective bargaining agreements, "casual employees" were not to receive fringe benefits or seniority.  The collective bargaining agreements did not define the term "casual employees," and the parties disagreed as to which employees were implicated by the term. The plaintiff argued that there was a common understanding that "casual employees" meant "employees who worked only sporadically or intermittently as needed."  The plaintiff further argued that several employees, erroneously labeled "casual employees" by the defendant, were in fact performing the same work as "regular" employees and in many cases working the same amount of hours.  The plaintiff argued that these employees were not in fact "casual employees," and that accordingly, contributions were due and owing on their behalf.  The defendant argued that its interpretation of "casual employees," which excluded the employees in question from receiving benefits, was "consistent with the collective bargaining agreements," that there was "no dispute or misunderstanding about casuals" between the employer and the union, that "none of the 'casuals' were confused about their status as casuals," and that the only party complaining was the plaintiff.

The district court, in <u>Central States</u>, found the term "casual employees" to be ambiguous, and accordingly held that the defendants had not violated the collective bargaining agreements. The Eighth Circuit Court of Appeals disagreed. The court found that the term "casual employees" was unambiguous, citing to the dictionary definition of the term as provided in <u>Black's Law Dictionary</u>. The court further found that regardless of the defendants' ascribed meanings to the term "casual employees," there was a common understanding that the meaning of the term was that of its dictionary definition, not the "unique" meaning that the defendants had proposed.

In response, the defendant argues that the plaintiffs have not met their initial burden because there is no definition of "work covered" in the collective bargaining agreement. The defendant further argues that regardless of what may or may not in fact constitute "work covered" by the collective bargaining agreement, and regardless of whether the employees in question were actually performing work covered by the collective bargaining agreement, contributions were not due until those employees were properly classified, and it was the Union that was responsible for classifying the defendant's employees pursuant to an oral side agreement between a Union representative and Duball, Sr.[21]

The court finds that it was the defendant's responsibility to ensure that its employees became classified, and that the defendant's failure to do so does not excuse its duty to contribute on behalf of its employees performing work covered by the collective bargaining

---

[21] The court rejected this argument in its March 31, 2005 Order granting Third Party Defendant 405's motion for summary judgment. The court rejected the defendants' argument concerning a purported verbal side contract on the basis that such a separate, verbal side agreement is disallowed pursuant to § 302(c)(5) of the LMRA which requires that payments from an employer to an employee trust fund be made according to a written agreement. As concerns the defendants' argument that the court's ruling in this regard now dictates that the court not consider industry practice in determining what work is covered by the collective bargaining agreement at issue, the court finds that the defendants have misinterpreted the court's prior ruling. Specifically, there is a vast difference between allowing enforcement of a separate side agreement and considering evidence on industry practice in determining what meaning should be given to a term in the collective bargaining agreement.

agreement.  First, the court rejects the defendant's argument that they did not owe contributions on behalf of employees who were not classified for them.  The defendant's argument in this regard amounts to nothing more than an assertion that the defendant should be excused from its duty to contribute after having buried its head in the sand concerning which of its employees were performing work covered by the agreement.  If the court were to agree with the defendant's position in this regard, the collective bargaining agreement would be rendered useless, especially in light of Duball, Sr.'s testimony that his primary reason for entering into the agreement in the first place was to get benefits for his employees.  Likewise, Duball, Sr.'s claim that he had no understanding of what work was covered by the collective bargaining agreement cannot prevail, considering his experience and training[22] in the field of electrical work.[23]  Jerry Duball, Sr.'s explanation for why he did not make contributions on behalf of certain employees is simply insufficient:

> Q:     (Counsel for the plaintiffs) And after that meeting [concerning allegedly deficient contributions] did you go back and review your time cards and time sheets for the purposes of amending any prior contribution reports to make contributions on employees that you had not made contributions on?
>
> A:     (Jerry Duball, Sr.) I didn't know what to pay these people because I was with the understanding that they could be

---

[22] Further, Tom Shea's testimony indicated that Jerry Duball, Sr. was one of Tom Shea's directors of training while Mr. Shea was a student in the apprenticeship program in 1975.  He testified that Jerry Duball Sr. oversaw the teachers who instructed the apprentices.  Part of the curriculum included teaching the apprentices about the relationship between the NECA and the Union.  Mr. Shea testified that, in this apprenticeship program, he was instructed that involvement in "anything that will convey electrical power from point A to point B" was considered collective bargaining unit work.

[23] Specifically, Jerry Duball, Sr. testified that he began the apprenticeship program with IBEW Local 405 in 1965 as an apprentice, graduated from the program in 1970, and began working as an apprentice in the field of electrical distribution at that time.  He also taught the fourth-year apprentice class for some time, which involved instruction on classification of workers involved with electrical distribution.

categorized so that I could pay 'em the proper amount, and at that meeting basically I told everyone that if there was some misunderstanding about me not knowing the proper amounts weren't paid, that I would make restitution to them. When the audit came about, the restitution was out of this world. It was nothing compared to what if these people had been categorized . . . all commercial journeymen, I still wouldn't have paid any amount close to that, but a fair amount I was willing to pay for what they had . . . but they deemed not to do that. . . . [T]his whole issue is about . . . getting Jerry Duball.

The following exchange between the court and Jerry Duball, Sr. further illustrates that he was not doing what was expected of him in regard to contributing on behalf of some of his employees:

Q:      (The court) Here's what I don't get: I don't get if this classification is so important so that your employees can get their health and welfare benefits that you want them to have, why don't you just make them go down there like tomorrow and get it done.

A:      (Jerry Duball, Sr.) I don't know what to pay them because of their classifications- -

Q:      (The court) So tell them to get down there and get classified and do it tomorrow because I'm not going to get you any benefits until you do.

A:      (Jerry Duball, Sr.) I told them to go there.  I can't force them.

Q:      (The court) Hold it. You're the employer.  You can force them to do all sorts of stuff.  Just say you either get your butt in there next week or don't come back next Monday. Can't you do that?

A:      (Jerry Duball, Sr.) Possibly I could have.  I don't - . . .

Q:      (The court) Here's another option.  If for an electrician who's out there and you don't know if he's an apprentice or journeyman and you've got all these different pay rates that could possibly be the contribution, why don't you just pick the

smallest one and pay something that you know that you will certainly owe as a sign that you're willing to make these payments?

A: (Jerry Duball, Sr.) I probably could have, but I'd have probably got another audit on that . . . I wanted them all to go to the hall so they could be classified. I made a mistake. I didn't understand their rules. I offered to make restitution numerous times, and that's not what- - I don't think that's what this is about.

Second, the court finds that the term at issue in the collective bargaining agreement, "work covered by this Agreement," is unambiguous, and that the plaintiffs have demonstrated that there was a common understanding that any employee who was performing electrical distribution work was a member of the collective bargaining unit and performing "work covered" by that agreement. See Central States, 919 F.2d 1343 (8th Cir. 1990). The plaintiffs have further established that there was a common understanding by those who work in the electrical installation field that the term "electrical work" encompasses anything that involves connecting electricity from a power source to a residence or other building as well as any work that involves conveying electricity from one point to another.[24] Finally, the plaintiffs have demonstrated that there was a common understanding that all employees were part of the bargaining unit and were "covered" employees, other than those who were part of management, clerical employees, truck drivers, unindentured apprentices,[25] and employees who performed only tasks such as delivery persons and shop personnel who repaired tools and trucks.[26] Contributions for

---

[24] Testimony of Tom Shea.

[25] Testimony at trial indicated that an "unindentured" apprentice is someone who is not an official member of the apprenticeship class, and often times someone who has no electrical background or experience. Testimony further indicated that there is common practice whereby unindentured apprentices are still referred out for work as an apprentice.

[26] Testimony of Chuck Swore, Tom Shea.

the Health and Welfare Plan were due on behalf of all bargaining unit employees. Contributions for the Pension Fund were due for all bargaining unit employees other than those excluded, as described above.

## B. Whether the Employees were Performing Covered Work

Having found that the term "work covered" by the collective bargaining agreement is an unambiguous term that was commonly understood to include any work involving electrical distribution, the court turns to the question of whether the plaintiffs have established that the employees were in fact performing covered work. As the court has previously noted, Mr. Heller's audit reports are insufficient to establish the plaintiffs' claims in this regard. Rather, the court will determine whether each employee at issue was performing "work covered" based on the evidence presented at trial, including testimony, time cards and job tickets, as well as the plaintiffs' "summary of hours showing 'covered work' for [the employees] included in the plaintiffs' appendix to their post-trial brief.[27] The relevant time period concerning whether contributions were owed for any of the employees at issue is August 1, 2000 through December 10, 2001. The court notes that in referencing each employee's dates of service, the court does not include any of the employees' periods of employment with the defendant falling outside of the relevant time frame. The court considers each employee at issue in turn.

The defendant concedes that Eric Baily was covered by the collective bargaining agreement after March 30, 2001, because that is when he was properly classified as an apprentice. The point of dispute for Mr. Baily, therefore, concerns only the period in which Mr. Baily was allegedly performing covered work but not classified, prior to March 30, 2001. Mr. Baily began his employment with the defendants on April 3, 2000. The evidence in this case established that Mr. Baily was employed with the defendant and

---

[27] The court takes note that rather than having to calculate contributions owed at different rates based on overtime, the plaintiffs have elected to convert overtime hours into straight time hours by utilizing a 2 to 1 ratio: 2 hours of straight time equaling 1 hour of overtime.

worked as a commercial or "inside" electrician from August 1, 2000, through October 24, 2001, but that the defendant did not contribute on behalf of Mr. Baily until May, 2001.[28]

The evidence at trial established that Zachariah Hale was employed with the defendant as a residential electrician from August 3, 2000 through June 19, 2001, and that during that time the defendant did not make any contributions to either of the plaintiff Funds on his behalf. The plaintiffs have also established that Chris Carter was employed with the defendant from June 5, 2001, through August 31, 2001, as a residential electrician, and that during that time the defendant did not make any contributions to either of the plaintiff Funds on his behalf.

The plaintiffs have also demonstrated that Dustin Novak was employed by the defendant from August 2, 2000, through December 10, 2001, and that he worked as residential electrician. The evidence indicated that the defendant did not contribute to either of the plaintiff Funds on behalf of Mr. Novak and under reported his hours until August, 2001. The evidence at trial established that Ryan Gericke was employed by the defendant as a commercial or "inside" electrician from August, 2000 through September, 2001, and that the defendant did not contribute on his behalf to either of the plaintiff Funds during that time.

The court further finds that B.J. Myrick was employed by the defendant from March 1, 2001, through October 19, 2001, working as a commercial or "inside" electrician. The evidence established that the defendant did not contribute to either of the plaintiff Funds on his behalf and under reported his hours until September, 2001. Finally, the court finds that the plaintiffs have demonstrated that J. Keith Collins was employed with the defendant as a residential electrician from June 11, 2001, through December 10,

---

[28] The table produced by the plaintiffs concerning Mr. Baily's contributions appears to indicate that the defendants contributed to the Pension Fund on Mr. Baily's behalf in April, May, June, July, August, September, and October of 2001, and that the defendants were not delinquent as to Health and Welfare Fund contributions for Mr. Baily in June, August, September, or October of 2001.

2001, and that the defendant did not contribute to either of the plaintiff Funds on Mr. Collins' behalf and under reported his hours until September, 2001.

Having determined that the plaintiffs have produced sufficient evidence to raise genuine questions about the accuracy of the defendant's records and the number of hours worked by the employees, the burden then shifts to the defendant to come forward with evidence of the precise amount of work performed.[29]   See Trustees of the I.B.P.A.T. Local 447 Pension Plan v. Five Seasons Paint and Drywall, Inc., 01-CV-0027 (N.D. Iowa 11/5/2002) (citing Brick Masons Pension Trust v. Indust. Fence & Supply, 839 F.2d 1333, 1338 (9th Cir. 1998); Motion Picture Indus. Pension & Health Plans v. N.T. Audio Visual Supply, Inc., 259 F.3d 1063, 1066-67 (9th Cir. 2001) (internal citations omitted).  The defendant, rather than offering any evidence concerning the precise amount of work performed by the employees in question to refute the evidence offered by the plaintiffs, argue that "once the Union provided the classification information [concerning the employees], [the defendant] made appropriate contributions."[30]   Accordingly, the court finds that the defendant has failed to meet their burden of showing the precise amount of work performed by the employees in question, as the plaintiffs' evidence in this regard stands unrefuted.  Having determined that contributions are owed, the court must consider the appropriate rate of those contributions.

### C. Rate of Contributions Owed

The plaintiffs argue that the rate of contributions for a journeyman electrician " is the rate that the court should apply in determining the amount of contributions owed."  At the conclusion of the two-day trial in this matter, the court  directed the plaintiffs to

---

[29] While the court considered the testimony offered at trial, the time cards and job tickets, and the plaintiffs' summary of hours in making this determination, the court notes that the testimony at trial alone was sufficient to raise genuine questions about the accuracy of the defendant's records.

[30] See Defendant's post-trial memorandum, p. 11.

provide the court with appropriate authority for the proposition that the journeyman rate is the appropriate default rate to apply.

In their post-trial memorandum, the plaintiffs cite to <u>Schembre v. Orth Construction Company</u>, 199 F. Supp. 2d 944 (Eastern Division Mo., October 24, 2001). The plaintiffs assert that <u>Schembre</u> addresses the issue at hand: whether courts routinely apply a journeyman rate, or the highest possible rate, as a "default" rate once it has been established that employees were performing work covered by a collective bargaining agreement and the employer has failed to make contributions on behalf of the employees. The court finds that <u>Schembre</u> does not stand for the proposition proffered by the plaintiffs. In <u>Schembre</u>, the court found that contributions were owed on behalf of some employees who were performing work covered by the collective bargaining agreement, but had not been properly classified as journeymen or apprentices. The court, in <u>Schembre</u>, found that although the employees were not actually apprentices as they had failed to complete the apprenticeship program, and were not journeymen, the employer was obligated to make contributions on their behalf because they were nevertheless performing work covered by the collective bargaining agreement. The court noted:

> The plain language of the collective bargaining agreement requires [the employer] to contribute to the Funds for persons performing covered work. The agreement does not require that employees be properly classified as journeymen or apprentices before employer contributions are required. [The employees] did cement masonry work, although they were neither journeymen nor apprentices. [The employer] also argues that the apprenticeship program office did not notify it that [the employees] were not properly registered as apprentices. This is not a defense to the plaintiffs' claims. The collective bargaining agreement does not place upon the apprenticeship educational program the duty to so notify the employer of the status of apprentice program applicants. . . . [The employer] at its own risk failed to inform itself about the status of these employees and to contribute to the Funds or not as the CBA provided.

The Schembre court ordered that the employer pay the delinquent contributions, but nowhere in the opinion does the court address whether or why it applied a journeyman rate when calculating the contributions. In calculating the contributions owed, the court applied a rate of $5.62 per hour pursuant to the collective bargaining agreement, which obligated the employer to contribute "the sum of $5.62 per hour 'for each actual hour worked by each employee covered by this Agreement except apprentices who have not completed their third term.'" The Schembre court did not clearly indicate that it was applying the journeyman rate as a "default" rate.[31] Of greater significance, the Schembre court did not even address the issue of whether courts routinely apply a journeyman rate as a default rate in cases such as this. The Schembre case simply does not stand for the proposition that the journeyman rate is the correct rate for a court to default to in determining the amount of contributions owing.

The plaintiffs further assert that the court should apply the journeyman rate as a default rate of contributions in this case because the "unrebutted testimony at trial confirmed" that the journeyman rate is the appropriate contribution rate to apply in this case. The plaintiffs point to Richard Sundermeyer's testimony at trial, in relevant part, as follows:

> Q: (Counsel for the plaintiffs) If a contractor who is bound by the collective bargaining agreement . . . employs persons who are - - employers doing electrical work who are not established as journeyman by the joint apprenticeship training committee which you work for or they're not established as unindentured apprentices by the committee you're working for,

_____

[31] Without such an indication by the court, one can assume that the rate of $5.62 per hour, set forth in the collective bargaining agreement in Schembre, applies to journeymen as well as employees "who are covered by [the] Agreement except apprentices who have not completed their third term." Accordingly, it is impossible for this court to even determine whether the court applied the rate based on defaulting the employees' status to journeymen rather than by defaulting the employees' status to apprentices who had completed their third term. Again, regardless of whether the Schembre court actually used the journeyman rate in calculating contributions, the court did not speak to the appropriateness of doing so.

isn't it true that all other people then are treated as journeyman for purposes of their pay rate and contribution rate under that collective bargaining agreement?

A:      (Sundermeyer) Yes.

. . .

Q:      (Counsel for the plaintiffs) If prior to Ryan Gericke's being admitted as an apprentice by the joint apprenticeship training committee or prior to his being designated by the joint apprenticeship training committee as an unindentured apprentice, if he was performing electrical work for Duball Electric he would have been considered a journeyman; is that correct?

A:      (Sundermeyer) That is correct.

Q:      (The court) Why?

A:      (Sundermeyer) If you're doing electrical work and you're not an apprentice or an unindentured apprentice, you're considered a journeyman. I basically only dealt with the apprentice, the unindentured and indentured apprentice.

. . .

Q:      (Counsel for the plaintiffs) So someone who is not an apprentice and not unindentured if they work on a job for which there are federal contributions or if they're working overtime, the overtime calculation rate for purposes of Wage and Hour Act is going to be the journeyman rate, is that correct?

A:      (Sundermeyer) That's correct.

. . .

Q:      (The court) I'm just not as sharp as all you guys on this labor stuff, so I have to ask another question. Is that [defaulting to the journeyman rate] because it just defaults to the highest rate if you don't [classify], or what?

A:      (Sundermeyer) Yes, I'm sure that's true. I mean that way everybody is classified one way or another. If you're not

> an apprentice, you're a journeyman regardless of your skill
> level as far as [the] contract's concerned.

The court finds that the plaintiffs' reliance on the Schembre case and the testimony set forth above does not provide a sufficient basis for the court to apply the journeyman rate as a default rate for purposes of calculating the contributions owing. While Mr. Sundermeyer's testimony clearly establishes that he believes that the journeyman rate is the correct rate to default to, it does nothing to establish any proper authority for this court to do so. Accordingly, the plaintiffs shall recompute the delinquent contributions as follows: for employees Eric Baily, B.J. Myrick, and Ryan Gericke, the plaintiffs shall recalculate contributions based on these employees being deemed apprentices performing covered work as inside/commercial electricians. For employees Zachariah Hale, Dustin Novak, Chris Carter, and J. Keith Collins, the plaintiffs shall recalculate contributions based on these employees being categorized as apprentices performing covered work as residential electricians. The defendant shall have 10 days from the date of the plaintiffs' filing of these amended calculations to respond.

### D. Penalties

The plaintiffs have requested that penalty fees[32] be awarded pursuant to the collective bargaining agreement.[33] The defendant argues that the collective bargaining

---

[32] The court notes that throughout the course of this litigation, the plaintiffs have consistently requested the $50.00 per day penalty fee pursuant to the collective bargaining agreement, amounting to greater than $90,000.00. However, in the plaintiffs' prayer for relief in their post-trial memorandum, the plaintiffs for the first time request the "greater of interest or plan penalty" in the amount of $13,679.10.

[33] As set forth elsewhere in this Order, the collective bargaining agreement provides, in relevant part, as follows:
> PENALTY FOR DELINQUENT CONTRIBUTIONS. All
> reports and contributions that are not received by the twenty-
> fifth day following the end of each calendar month shall be
> deemed delinquent and shall be assessed liquidated damages
> amounting to fifty dollars ($50.00) per day for each and every
> working day the reports and contributions are delinquent. . . .

(continued…)

agreement's penalty provision may not be enforced because ERISA caps such penalties at the greater of (a) 20% of the contribution deficiency; or (b) the interest accrued on the delinquency. ERISA's civil enforcement section, codified at 29 U.S.C.A. § 1132(g)(2), provides:

> In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan–
>
> (A)    the unpaid contributions,
> (B)    interest on the unpaid contributions,
> (C)    an amount equal to the greater of–
>         (i)    interest on the unpaid contributions, or
>         (ii)    liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),
> (D)    reasonable attorney's fees and costs of the action, to be paid by the defendant, and
> (E)    such other legal or equitable relief as the court deems appropriate.
>
> For purposes of this paragraph, interest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of Title 26.[34]

---

[33] (…continued)

> In the event the trustees are required to place any contractor account in the hands of legal counsel for collection, the employer shall be liable, in addition to all scheduled contributions, for all attorneys' fees and all reasonable costs incurred in the collection process including but not limited to filing fees, sheriff's fees, audit costs, interest and other expenses incurred by the trustees.

[34] 26 U.S.C.A. § 6621(a)(2) provides that the underpayment rate shall be the sum of the Federal short-term rate determined under subsection (b) plus 3 percentage point.

(continued…)

29 U.S.C.A. § 1132(g)(2) applies when (1) the fiduciary obtains a judgment in favor of the plan; (2) unpaid contributions exist at the time of the suit; and (3) the plan provides for liquidated damages. <u>Chicago District Council of Carpenters Pension Fund v. Industrial Erectors, Inc.</u>, 840 F. Supp. 1248, 1256 (N.D. Ill. 1993) (citing <u>Idaho Plumbers and Pipefitters v. United Mechanical</u>, 875 F.2d 212, 215 (9th Cir. 1989)). Here, the plaintiffs have established that the defendant is responsible for delinquent contributions to the plaintiff Funds.[35] Further, the unpaid contributions remained unpaid at the time of the suit in this matter. Finally, the collective bargaining agreement in this case calls for liquidated damages in the form of penalties. The court concludes, therefore, that § 1132(g)(2) applies and the plaintiffs are entitled to penalty fees in an amount not greater than 20% of the unpaid contributions. Because the amount of unpaid contributions is yet to be determined, it follows that the amount of penalties and interest are also yet to be determined.

Upon the foregoing,

IT IS ORDERED that the court finds in favor of the plaintiffs Local 405 Trustees of the I.B.E.W. Local Union 405 Deferred Savings Fund and Local 405 Trustees of the I.B.E.W. Local Union 405 Health and Welfare Fund, and against Defendant Duball Electric, Inc., as to the plaintiffs' claim for delinquent contributions pursuant to Sections 302(c)(5) of the Labor Management Relations Act (LMRA), 29 U.S.C. § 186(c)(5), §§ 502(a)(2)(3) and 515 of the Employee Retirement Income Security Act (ERISA),

---

[34] (…continued)
Subsection (b) provides that the Secretary shall determine the Federal short-term rate for the first month in each calendar quarter.

[35] The plaintiffs will obtain a judgment to that effect in accordance with this Order.

29 U.S.C. §§ 1132(a)(2), 1132(a)(3), and 1145, in an amount to be determined,[36] together with reasonable attorney's fees and costs in an amount to be determined.

December 13, 2005.

JOHN A. JARVEY
Magistrate Judge
UNITED STATES DISTRICT COURT

---

[36] The court orders that the plaintiffs submit complete and amended calculations concerning the unpaid contributions within 10 days of the date of this Order, calculating the contributions at the appropriate rate for apprentices rather than journeyman. The court further orders that the plaintiffs submit a complete and amended prayer for relief within 10 days of the date of this Order concerning interest and penalty fees sought. In accordance with 29 U.S.C.A. § 1132(g)(2), the penalty fee requested shall not exceed 20% of the claimed unpaid contributions as amended, and the applicable interest rate shall be 10% as provided in the collective bargaining agreement.